IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

**STATE OF TENNESSEE v. JOSHUA HILL-WILLIAMS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-03966      John Wheeler Campbell, Judge**

_____

**No. W2015-01743-CCA-R3-CD  -  Filed May 9, 2017**

_____

A Shelby County Criminal Court Jury convicted the Appellant of first degree premeditated murder, and the trial court sentenced him to life.  On appeal, the Appellant contends that the evidence is insufficient to support the conviction, that the trial court erred by ruling that evidence of the victim's gang affiliation was irrelevant to the Appellant's claim of self-defense, that the trial court erred by admitting hearsay text messages into evidence, and that the trial court erred by giving a flight instruction to the jury.  Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Vicki M. Carriker (on appeal and at trial) and Daniel K. Hamilton (at trial), Memphis, Tennessee, for the appellant, Joshua Hill-Williams.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and George Kirby May, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On December 21, 2013, the Appellant shot and killed Evvann "Juice" Harris.  At trial, Officer Chad Conley of the Memphis Police Department (MPD) testified that about 12:40 p.m. on December 16, 2013, he responded to a 911 theft call at the Appellant's home on Douglass Avenue and spoke with the Appellant.  The Appellant told the officer

that the victim had knocked on his door and that he had opened the door for the victim because he knew the victim. The Appellant claimed that he "set down his gun," that the victim grabbed it, and that the victim ran. The Appellant described the gun as a Glock 19, and he provided the gun's serial number, LGA460.

Officer Jerry Capps of the MPD testified that he was assigned to investigate the December 16 theft of the Appellant's gun. On December 19, the Appellant came to the police department, spoke with Officer Capps, and named the victim as the person who took the firearm. The Appellant also claimed that he chased the victim out of his home and into the front yard. The Appellant said the victim turned around, pointed the gun at him, and told him, "I will shoot you. I will kill you." Officer Capps acknowledged that the Appellant's claims about chasing the victim outside and the victim's threatening to shoot him were not in the original 911 report. Officer Capps put together a photograph array and showed it to the Appellant. The Appellant selected the victim's photograph and identified the victim as the person who took his gun.

Officer Capps testified that he told the Appellant that he was going to file an arrest warrant for the victim for theft and aggravated assault and that "it would take a couple of days to get that done." The Appellant was concerned about seeing the victim because they lived in the same area, and Officer Capps told the Appellant to stay away from the victim. Officer Capps also told the Appellant to leave the area and telephone the police if the Appellant saw the victim. The Appellant was "worried about a confrontation," and Officer Capps told him that "you have a right to defend yourself just like everyone else."

On cross-examination, Officer Capps acknowledged that the Appellant had a handgun carry permit and that people tended to be calmer and more clear-headed a few days after an incident. The Appellant "seemed a little worried about his safety." He was very cooperative, wanted his pistol returned to him, and wanted the victim to go to jail.

Shandra Denise Harris, the victim's mother, testified that in December 2013, the victim was twenty-one-years old; lived with her; and was employed by Staff Line, a temporary service. On Saturday, December 21, the victim was at home with his mother. About 2:00 p.m., she drove him to a friend's house in the Barron Court Apartments. The victim referred to his friend as "Big Red." About 4:00 p.m., Ms. Harris received a telephone call that the victim had been shot.

Officer Brandon Westrich of the MPD testified that about 4:00 p.m. on December 21, 2013, he responded to a shooting in an apartment at the Barron Court apartment complex. When Officer Westrich arrived, a man met him outside the apartment and said his friend had been shot inside the apartment. Officer Westrich opened the door and saw the victim lying on his side. The victim had multiple gunshot wounds, and Officer

Westrich used a towel to apply pressure to a gunshot wound in the victim's neck until members of the fire department arrived. Firemen cut off the victim's clothes and discovered a Glock 19 pistol with an extended magazine in the front of his waistband. The magazine was loaded, and the serial number for the gun was LGA460. The fire department transported the victim to the hospital. Three or four other people were in the apartment, and Officer Westrich immediately developed the Appellant as a suspect.

On cross-examination, Officer Westrich testified that he saw no signs of forced entry into the apartment. On redirect examination, he testified that he did not see the gun in the victim's waistband until the firemen cut off the victim's clothes because the victim's shirt was covering the gun.

Officer Josh Shearer of the MPD testified that he responded to the Barron Court apartment on December 21 and saw an African-American male lying on the floor. Officer Shearer described the location of the victim as follows: "When you walk into the apartment there's a couch to the right, then the left corner I'm not sure which direction, I'd have to look at a map but he was laying in the corner." Officer Westrich was assisting the victim, who had been shot several times. The victim was bleeding "quite a bit," so the officers tried to stop the bleeding as much as possible. Officer Shearer said he never noticed a firearm while he was helping the victim. On cross-examination, Officer Shearer acknowledged that other people were in the apartment.

Latrice Mills testified that about 4:15 p.m. on December 21, 2013, she was driving in the area of the Barron Court Apartments and saw more than two men run out of an apartment. The men ran to a church parking lot next door to the apartment complex and got into an "older red car with some shade of gray on it." Mills saw the car "fly past" her and "turn down a side street."

On cross-examination, Mills testified that it was still light outside and that one of the men had a gun in his waistband. Mills was driving about thirty-five miles per hour, and she acknowledged that the red car may have been traveling only forty miles per hour when it passed her. On redirect examination, Mills testified that the red car "got to the next block pretty quick, it was trying to get away from the scene."

Dexter Blakely testified that he knew the victim and the Appellant through mutual friends in the Orange Mound neighborhood of Memphis. On December 21, 2013, Dexter[1] was at the Barron Court apartment of his cousin, Jevonda Harris. Harris was not there, but the victim; Tranishi Wright, Dexter's girlfriend; Eldridge Bobo; Demarco "Big

---

[1] Because Dexter and Demarco Blakely share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

Red" Blakely; and Gerard Butler were there. Dexter said that "[e]verybody was just talking, chilling," that he and Wright went into a back room, and that he heard four or five gunshots. He went into the living room and saw the victim lying on the floor in a corner.

On cross-examination, Dexter testified that he never saw the victim with a gun and that he did not know the victim had a loaded gun that day. He acknowledged telling a police officer that he heard three or four gunshots.

Eldridge Bobo testified that he had known the victim and the Appellant five or six years. On the afternoon of December 21, 2013, Bobo, "Tootie," "Big Red," and "Little D" were in Jevonda Harris's living room. Dexter Blakely and Tranishi Wright were "in the back." Bobo said that he was sitting on the couch, that Tootie was sitting to his right, that the victim was sitting in a folding chair next to a card table, and that Demarco was asleep on a loveseat. At some point, Bobo received a telephone call from his friend, "Albert." During their conversation, Bobo told Albert the names of the people who were in the apartment. Thirty minutes to one hour later, Bobo heard a knock on the door. Demarco answered the door, and someone pushed him backwards into the apartment. Bobo saw an arm extend into the doorway and saw a gun. He said that he heard "like commotion" and "pow" and that he jumped over the couch. There was a pause, and he then heard "pow, pow, pow." The shooter ran away.

On cross-examination, Bobo acknowledged that the commotion he heard could have been two bodies colliding. Later that day, he gave a written statement at the police department. He denied telling the police that he heard the victim say "what's up" just prior to the shooting. He said he did not know the victim had a gun on December 21.

Twenty-four-year-old Demarco "Big Red" Blakely testified that he had known the victim since Demarco was sixteen years old and the Appellant since Demarco was five or six years old. In December 2013, Demarco was living with his cousin, Jevonda Harris, in the Barron Court Apartments. On the afternoon of December 21, Demarco was at the apartment and was in the living room with the victim, Gerard Butler, and Eldridge Bobo. Dexter Blakely and Tranishi Wright were in the back room. Demarco was asleep on a couch by the door, Bobo and Butler were sitting on another couch, and the victim was sitting in a folding chair. Demarco heard a knock on the door and answered it. The Appellant was standing at the door and had a black pistol in his right hand. The gun was at the Appellant's side.

Demarco testified that the Appellant "poked his head in" the apartment to see if the victim was there. The Appellant then pushed Demarco out of the way, looked at the victim, and asked, "[W]here my gun?" The victim began to stand up, and the Appellant

- 4 -

started shooting at him. The Appellant fired one shot, paused, and fired "four or five quick ones." Demarco said that he was afraid the Appellant was going to shoot him and that he "stepped out" of the apartment. After the shooting, the Appellant "walked off" to a parking lot. Someone telephoned the police, and Demarco telephoned the victim's mother. He later looked at a photograph array and identified the Appellant as the shooter.

On cross-examination, Demarco acknowledged that the men had been smoking marijuana in the apartment that day. He said that he knew the victim had stolen the Appellant's gun but that he did not know the victim had the gun on his person at the time of the shooting. The victim did not say anything to the Appellant before the shooting.

Twenty-three-year-old Gerard Butler testified that he had known the victim since Butler was fifteen but that he did not know the Appellant. On the day of the shooting, Butler was at the apartment and heard a knock on the door. Demarco opened the door, and "[there] was an argument." Demarco said something like, "[D]on't bring that [sh**] over here." Butler saw the Appellant come into the apartment with a gun. The Appellant pointed the gun at the victim, and the victim stood up. The Appellant said something to the effect of, "[Y]ou're not going to take nothing else." He walked to the victim and shot at him seven or eight times. Butler said he ran out of the apartment and called 911. He did not see the Appellant leave the apartment, but he saw someone "jump in a red car" that was in the church parking lot and saw the car "pull off." A second person was in the car, which was a black or red Camaro.

On cross-examination, Butler testified that he did not smoke marijuana that day. He said the victim did not say anything to the Appellant or take any steps toward the Appellant prior to the shooting. He denied telling police officers that the victim "tried to rush" the Appellant.

Officer David Smith of the MPD testified that he arrived at the apartment after the shooting to collect evidence and take photographs. The apartment was in disarray, and a substance that appeared to be blood was on the floor. Officer Smith collected a Glock firearm, eight nine-millimeter spent shell casings, and two bullet fragments.

Sergeant Lorenzo Young of the MPD testified that he went to the apartment after the shooting. The victim had been removed from the scene, but blood was on the floor where the victim had been lying. Sergeant Young said that a Beretta nine-millimeter handgun ejected shell casings to the right and that the casings "[popped] out" one to three feet from the gun. He said most of the shell casings found in this case were near the body, indicating that the victim had been shot at very close range. On cross-examination, Sergeant Young testified that members of the fire department were in the apartment prior to his arrival, and he acknowledged that evidence could have been moved.

Officer John Nunnery of the MPD testified that on December 21, 2013, he and his partner were on patrol in the Orange Mound area when he heard a description of the suspect vehicle: a red, T-top Camaro with gray primer paint on it. About 4:28 p.m., Officer Nunnery and his partner located the car in the driveway of a home on Douglass Avenue. The home was about one and one-half miles from the scene of the shooting, and the officers later learned the residence was that of the Appellant

Officer Nunnery testified that he and his partner touched the Camaro and that it "was warm . . . like it had just been turned off." They heard a television inside the residence and knocked on the door, but no one answered. They looked inside the Camaro and saw an identification badge with the Appellant's name on it hanging from the rearview mirror. The officers waited by the car.

Officer Nunnery testified that about thirty minutes later, Jeremy Hill-Williams, who was the Appellant's brother, and Alan Sanders walked up to the Camaro. The officers detained the two men because they did not know if the men were involved in the shooting. Officer Nunnery patted down Sanders and collected a cellular telephone from his pocket. About thirty minutes later, the Appellant "came walking up." Officer Nunnery said he heard the Appellant tell another officer that "'things got out of control and I shot him.'" On cross-examination, Officer Nunnery acknowledged that neither Jeremy Hill-Williams nor Alan Sanders had a weapon on his person.

Officer Michael Jeffers of the MPD testified that on December 21, 2013, he went to the residence on Douglass Avenue. Officers on the scene had already detained two men, and Officer Jeffers saw the Appellant walking in the middle of Douglass. The Appellant had a gun in his right hand, so Officer Jeffers ordered him to the ground at gunpoint. The Appellant complied, and Officer Jeffers disarmed and handcuffed him. The gun was a nine-millimeter Beretta and contained a twenty-round magazine clip. The clip was loaded with seven rounds. As Officer Jeffers was putting the Appellant into a patrol car, the Appellant said that "'things got out of control and I shot him.'"

On cross-examination, Officer Jeffers testified that when he first saw the Appellant, the Appellant was walking toward the officer's patrol car and had his hands up. The slide on the Appellant's gun was "locked back," meaning it had "ejected [a round] but [had] not come back forward to chamber another round, a live round."

Officer Charles Webb of the MPD testified that he transported the Appellant from Douglass Avenue to the police department. En route, the Appellant "made the statement that he wished he could have seen his face one last time." The Appellant also said that

"'you got to get your respect out here in these streets'" and that "'nobody's going to steal from me and get away with it.'"

Sergeant Robert Wilkie of the MPD's Homicide Bureau testified that he was the coordinator for this case, that the Appellant immediately became the suspected shooter, and that he interviewed the Appellant about 9:15 p.m. on December 21. The Appellant consented to a search of his cellular telephone.

Lieutenant Wilton Cleveland of the MPD testified that he was a cellular telephone and digital forensic analyst for the police department and that he compiled a summary of relevant calls and text messages made to and from the Appellant's telephone from December 16 to December 21, 2013. On December 16, the Appellant called 911 at 12:40 and 12:42 p.m. At 2:31 p.m., the Appellant sent a text to "Devin" that said, "'[You] got the wrong [n***a] bro, bring my [sh** back] and leave it at that.'" At 3:28 p.m., the Appellant sent a text to "Ra-Ra" that stated "Juice" had stolen his pistol. A text sent by the Appellant to "Desiree" 4:41 p.m. said that "snatched off the couch and ran out," and a text sent by the Appellant to Desiree at 4:47 p.m. stated that "'it's all good, I know where he lay at.'" At 8:12 p.m., the Appellant sent a text to J. Randolph that said, "'Juice [come and] stole my pistol, but it's all good, he [f***ed] two ways.'" At 8:18 p.m., J. Randolph texted to the Appellant, "'[D]on't hurt him too bad because I know you will.'" At 8:23 p.m., the Appellant texted J. Randolph that "'it's coming.'" At 11:17 p.m., J. Randolph texted to the Appellant, "'[B]e safe best friend, I got some bond money LOL.'"

Lieutenant Cleveland testified that on the morning of December 17, the Appellant sent a text to "Bro" that asked, "'[W]here the 9?'" Bro answered, "'[I]n the drawer. . . . [Y]our drawer.'" At 7:25 p.m., the Appellant received a text from Mundy Arab that said, "'[D]on't do nothing stupid . . . .'" At 7:26 p.m., Bro texted to the Appellant, "'I swing through Big Red spot.'" One minute later, the Appellant texted to Bro, "'[H]e over there?'" At 7:29 p.m., Bro answered, "'[F]rom what Albert telling me say he be over there all the time.'"

Lieutenant Cleveland testified that at 4:15 p.m. on December 21, the day of the shooting, the Appellant called 911, and the call lasted fifty-two seconds. At 4:28 p.m., the Appellant texted to his girlfriend, "'I just killed him. He up on me. Erase this message. I love you.'"

Erica Curry of the West Tennessee Forensic Center testified as an expert in forensic pathology that she performed the victim's autopsy on December 22, 2013. The victim had been shot nine times. One bullet entered his chin, fractured his lower jaw, and exited the right side of his neck. Dr. Curry did not see any soot or stippling around the wound, meaning the end of the gun was probably more than three feet from the victim

when it was fired. A second bullet entered the back of the victim's head. An exit wound was to the left of the entrance wound, and Dr. Curry described the gunshot as a "graze" wound. The damage caused by the bullet was not extensive but could have caused death if the victim did not receive medical attention. Dr. Curry found "sparse gunpowder stippling" around the entrance wound, indicating that the end of the gun was six inches to three feet from the victim when the gun was fired.

Dr. Curry testified that the victim had been shot four times in his torso: one bullet entered the left side of his chest, and three bullets entered his back. Dr. Curry did not find any soot or stippling around the wounds. Two exit wounds were in the victim's left torso, and each exit wound had an abrasion ring around it. Dr. Curry said that an abrasion ring usually occurred if a body was against a hard surface such as a floor or a wall when the bullet exited the body. Tight clothing also could cause an abrasion ring. The trajectories of the bullets in the victim's torso were downward, and the bullets fractured some of the victim's ribs. They also struck his left lung, small intestine, and both kidneys. Dr. Curry recovered two bullets from the victim's spine. A significant amount of blood was in his abdomen, and the three gunshots in his back were fatal.

Dr. Curry testified that the victim had been shot in the back of his right shoulder, which fractured a bone in his right arm, and in the back of his right forearm. Both of the wounds were survivable. Finally, the victim had been shot in his right hip. Dr. Curry concluded that the victim's cause of death was multiple gunshot wounds and that his manner of death was homicide.

Cervinia Braswell, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in forensic firearm identification that she examined a Glock nine-millimeter pistol and a Beretta nine-millimeter pistol and test-fired the guns. She also compared evidence collected in this case to test-fired bullets and cartridge cases. Bullets recovered from the victim during his autopsy had been fired from the Beretta. Bullet fragments recovered from the victim's head and right shoulder had the same class characteristics as the Beretta, but Braswell could not say definitively that they were fired from the gun. The eight cartridge cases collected from the apartment were also fired from the Beretta. The bullet fragments collected from the apartment had the same class characteristics as the Beretta, but Braswell could not say definitively that they were fired from the gun. The Beretta in this case ejected cartridge cases to the right and about eight feet from the gun. The cartridge cases could bounce if they landed on a smooth surface. On cross-examination, Braswell testified that a person could stand and walk toward someone even if the person had been shot. At the conclusion of her testimony, the State rested its case.

Jacqueline McDuffie testified that she had known the Appellant since 2012 and that her boyfriend and the Appellant were best friends. In December 2013, McDuffie heard that someone had taken a weapon from the Appellant. She texted to the Appellant, "'[D]on't hurt him too bad[.]'" Defense counsel asked what she meant by that statement, and she answered, "It was a figure of speech." McDuffie also texted to the Appellant, "'[B]e safe best friend, I got some bond money LOL[.]'" Defense counsel again asked what she meant by that statement, and she answered, "Another figure of speech. I don't have bond money, I don't make enough to afford bond money.'" McDuffie said she was trying to make the Appellant laugh because she "could tell that he was afraid." She said she was shocked when she learned the Appellant had shot the victim because the Appellant was "not that type of person to kill anyone." McDuffie also knew the victim. She said that she met the victim two or three times and that he had a violent reputation. On cross-examination, McDuffie testified that she was "J. Randolph" in the Appellant's cellular telephone directory.

Jasmine Smith, the Appellant's girlfriend, testified that the Appellant was kind-hearted, that he helped his friends, and that everyone in the neighborhood loved him. In December 2013, Smith and the Appellant were "on a break" from their relationship. On December 16, the Appellant telephoned Smith and told her that the victim had stolen his gun. The Appellant had a handgun carry permit and regularly carried the gun on his person. A few days later, the Appellant texted Smith that he had killed the victim. Smith said she "didn't think nothing of it" because she could not "imagine him doing something like that." The Appellant then telephoned Smith and asked her to drive him to "201."[2] Smith picked up the Appellant "[a]round the corner" from his house. En route to 201, the Appellant received a telephone call, telling him that the police had his brother in custody. The Appellant decided to return to his house, so Smith dropped him off at the intersection of Laurel and Douglass. She said that the Appellant was not violent and had never hurt her, that she had met the victim four or five times, and that the victim had a reputation in the community as a violent person.

The then twenty-three-year-old Appellant testified that Jeremy Hill-Williams was his twin brother. The Appellant was raised by a single mother, but his home-life was loving and stable. The Appellant graduated from high school in Memphis and moved to Nashville in early 2013 to "find a better environment." However, he moved back to Memphis a few weeks before the shooting because his mother's health was failing. He described Orange Mound as a "rough" neighborhood and said he had a handgun carry permit.

---

[2] We note that the address for the Memphis Police Department is 201 Poplar Avenue.

The Appellant testified that he met the victim through a mutual friend and that the victim "became like a little brother." The Appellant had known the victim at least three years at the time of the shooting and would give the victim a place to stay, food, a ride, or money if the victim needed it. In December 2013, the Appellant was working as a driver for Williams-Sonoma. On December 16, he got off work about 8:00 a.m. and went home to sleep. The Appellant slept about four hours and woke up to "banging on the windows" and "beating on the door." The Appellant grabbed his Glock 19 because "you never know what to expect" in the neighborhood, "peeked" out the blinds, and saw the victim. The Appellant unlocked the door and let the victim inside because the Appellant knew the victim.

The Appellant testified that the victim was "in a panic mode" and wanted to use the Appellant's telephone. The Appellant sat down and put his gun on the couch. The victim snatched the gun and ran out the door, and the Appellant chased him into the front yard. The victim turned around, pointed the gun at the Appellant, and said, "I swear to God I'll shoot you." The Appellant said he was "torn to pieces" by the victim's threat because the victim was "like my little brother." The Appellant went back inside and telephoned 911.

The Appellant testified that he was mad and acknowledged that he sent the text messages about the theft. He also sent text messages about obtaining another firearm and ammunition because "that first threat that was enough for me." When the victim stole the Glock 19, it was the only firearm the Appellant owned and was worth $500 to $600. The Appellant did not have a telephone number for the victim, so he texted Devin, who was the victim's friend. The Appellant said that when he texted "'it's coming'" to Jacqueline McDuffie, he meant that he had contacted the police and that the victim was going to jail. The next day, December 17, the Appellant was not looking for the victim at Demarco "Big Red" Blakely's house. Instead, he was looking for Demarco because he thought Demarco could help him get his gun back. The Appellant saw Eldridge Bobo on December 17, and Bobo told him about a death threat directed toward the Appellant. The threat was due to the warrant for the victim's arrest. The Appellant took the threat seriously and was scared.

The Appellant testified that by December 18, he was still upset but was no longer mad at the victim. On December 19, the Appellant met with Officer Capps about the theft of the gun and identified the victim's photograph from an array. On December 21, the Appellant took a shower and washed his Camaro. He acknowledged that Bobo was with him and that they were "hanging out." Later that day, the Appellant decided to go to Demarco's house "just to pass my telephone number to him to tell Evvann to call me." The Appellant arrived at Demarco's apartment about 4:00 p.m.

- 10 -

The Appellant testified that he always carried a gun with him. He knocked on the door of Demarco's apartment, Demarco opened the door, and the two men shook hands. The Appellant saw Bobo in the apartment and went inside to greet him. As the Appellant entered the apartment, he saw the victim out of the corner of his eye. The victim was "jumping up" from a chair, and the Appellant was surprised to see the victim because he did not know the victim was going to be there. The Appellant said that the victim was "going for his weapon" and that the Appellant made "a life decision" to defend himself. The Appellant pulled his gun from his waistband, he fired the first shot, and the victim fell. The Appellant said that he thought he fired a total of five gunshots and that he put the gun back into his waistband. He checked the victim for a pulse, and the victim had one. The Appellant left the apartment and telephoned 911 on his way out. During the call, which was played for the jury, the Appellant told the dispatcher that "he upped on me, so I killed him."

The Appellant testified that he drove home but that he did not stay there because he "[was] not sure who's going to come looking for [him] or looking for [his] car." He went to a friend's house and had Jasmine Smith pick him up there. While they were on their way to "201," the Appellant received a telephone call from a neighbor, telling him that the police had his brother in custody as the shooter. The Appellant said he could not let that happen, so he had Smith drop him off on Douglass Avenue. The Appellant walked toward his house, and a police officer arrested him. The Appellant was cooperative and told the police "the honest truth" about what happened.

On cross-examination, the Appellant acknowledged that he was friends with Eldridge Bobo, Demarco Blakely, and Dexter Blakely. He said that December 16 was the first time the victim had pointed a gun at him. When the Appellant went to Demarco's apartment on December 21, he parked in the apartment complex parking lot, not the church parking lot, and was armed with a Beretta nine-millimeter handgun. He did not see the victim with a gun, and the victim did not say anything before the Appellant shot the victim. He said he could not dispute the medical examiner's testimony that he shot the victim eight or nine times but that he did not remember shooting the victim in the back. On redirect examination, the Appellant testified that when he told the 911 dispatcher that "he upped on me," he meant that the victim tried to pull a gun on him. He said he called 911 because he had just shot his friend.

At the conclusion of the testimony, the jury convicted the Appellant as charged of first degree premeditated murder. The trial court sentenced him to life.

A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the conviction because it shows that he shot the victim in self-defense. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Relevant to this case, Tennessee Code Annotated section 39-11-611(b)(2) provides as follows:

> Notwithstanding § 39-17-1322,[3] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> >
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a

---

[3] Tennessee Code Annotated section 39-17-1322 states,

> A person shall not be charged with or convicted of a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim.

defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

The Appellant claims that the evidence proves he shot the victim in self-defense because the victim had threatened to kill him for reporting the theft of the gun to the police and because the victim "was drawing for his weapon." However, taken in the light most favorable to the State, the evidence shows that the Appellant was angry with the victim for taking his gun. In the hours after the theft, the Appellant sent text messages stating that he knew were the victim "'lay at,'" that the victim was "'[f***ed] two ways,'" and that "'it's coming.'" The day after the theft, the Appellant sent text messages to his brother, indicating that he was trying to obtain another firearm and asking if the victim was at Demarco Blakely's house. On December 21, the Appellant went to Demarco's apartment. The Appellant was armed with a loaded Beretta nine-millimeter pistol and knocked on the door. When Demarco opened the door, he saw the Appellant holding the gun. The Appellant forced his way into the apartment and asked the victim about his firearm. As the victim began to stand, the Appellant shot him, paused, and shot him numerous additional times. According to the Appellant's own testimony, the victim fell after the first gunshot. In total, the Appellant shot the victim nine times, including one time in the back of his head and three times in his back, and some of the wounds occurred at close range. Although the victim had the Appellant's gun on his person at the time of the shooting, firemen found it still in the victim's waistband when they cut off his clothes. Thus, the jury reasonably convicted the Appellant of first degree premeditated murder and rejected his claim of self-defense.

## B. Victim's Gang Affiliation

The Appellant claims that the trial court erred by not allowing him to question witnesses about the victim's gang membership. He contends that the evidence was relevant to his state of mind for self-defense and showed that the victim was a person of violence and, therefore, the first aggressor. He also contends that the State's questioning the victim's mother about the victim's work history and background opened the door to "the other side" of the victim's character. The State argues that the trial court properly excluded the evidence. We agree with the State.

During the State's case-in-chief, defense counsel repeatedly requested to question witnesses about the victim's gang affiliation. However, the trial court ruled that the evidence was irrelevant and that, in any event, the prejudicial effect of the evidence "far outweigh[ed]" its probative value. Just prior to the Appellant's case-in-chief, defense counsel advised the trial court that the victim was known in the community as a violent person and that the defense wanted "to go into the fact" that the victim was a member of a gang. Counsel argued that the evidence was relevant to the Appellant's claim of self-

defense because it went to his state of mind and whether he reasonably feared the victim. The trial court noted that the Appellant had not yet testified and that a claim of self-defense had not yet been raised. The court then ruled that, regardless, "whether he's in a gang or not is really irrelevant because if he -- if they say he's a violent person or that he has that reputation whether he's in a gang or not is completely irrelevant. . . . You can be in a gang, I guess, and not be a violent person." The court ruled that the Appellant's witnesses could testify about the victim's having a violent reputation but that testimony about his being in a gang was "too much." On direct examination, Jacqueline McDuffie and Jasmine Smith testified for the Appellant that the victim had a reputation in the community for violence. In an offer of proof, McDuffie testified that the victim was a member of the Bloods.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible."

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). Nevertheless, if a defendant raises a claim of self-defense, then Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor." Neil P. Cohen, et al., Tennessee Law of Evidence, § 4.04[5][c] (6th ed. 2011). However, pursuant to Tennessee Rule of Evidence 405(a), this substantive evidence may be established only by reputation or opinion and specific acts may be inquired into only on cross-examination. Id.

Turning to the instant case, we agree with the trial court that the victim's gang membership was not relevant to the Appellant's claim of self-defense. At trial, the Appellant testified that he feared the victim because of the victim's threatening to shoot him in the yard and because of the death threat he received for reporting the gun theft to the police. The Appellant never made an offer of proof at trial in which he stated that his knowledge of the victim's gang affiliation played any part in his decision to shoot the victim. See State v. Jamaal L. Byrd, No. E2013-00365-CCA-R3-CD, 2014 WL 545451, at *8 (Tenn. Crim. App. at Knoxville, Feb. 10, 2014), perm. to appeal denied, (Tenn. Aug. 25, 2014). At the motion for new trial hearing, defense counsel asked the Appellant how the victim's "gang reputation" affected the Appellant on the day of the shooting, and the Appellant stated, "I didn't know what he was going to do because his intentions, he send so many words through people." The Appellant did not say that the victim's gang membership caused him to fear victim. The trial court properly allowed defense

- 15 -

witnesses to testify at trial that the victim had a reputation for violence, which was relevant to the Appellant's self-defense claim. Thus, we conclude that the Appellant is not entitled to relief.

As to the Appellant's claim that the State opened the door to evidence about the victim's gang membership, the record reflects that the victim's mother testified that he was the youngest of her three children, that he worked for a temporary service, and that he lived with her. We fail to see how her testimony painted the victim in such a favorable light that it opened the door to "the other side" of his character. Thus, we find no merit to this claim.

## C. Text Messages

Next, the Appellant claims that the trial court erred by admitting into evidence text messages he received because the texts were hearsay and because the State's prepared summary of "relevant text messages" did not present "a complete and accurate picture of the events that led up to the shooting." The State argues that the received text messages were not hearsay because they were introduced to put the Appellant's sent text messages into context, not for the truth of the matter asserted. The State also argues that its summary was admissible and notes that a forensic report containing all of the text messages was admitted into evidence. We agree with the State.

Prior to Lieutenant Cleveland's testimony, defense counsel advised the trial court that the officer had conducted a "cell phone dump" of the Appellant's text messages from December 10 through the day of the shooting. Counsel argued that any text messages sent by the Appellant prior to December 16 were not relevant and that any text messages sent by other people and received by him were hearsay. The State argued that the texts received by the Appellant were not hearsay because they were needed to put text messages sent by the Appellant into context. The State agreed to limit the time frame for the text messages to December 16 through the day of the shooting and that it could present a summary of relevant texts or "the whole record of the 16th through the 21st."

The trial court ruled that the text messages received by the Appellant were not hearsay "but to put in context the response that the defendant made to those messages and it goes to state of mind." The court also ruled that the State could submit its summary of the relevant text messages but that "I think in fairness in the interest of completeness we'll put all of them in and ya'll can argue whatever you want." Defense counsel responded that the State's summary was "a work product" and that the complete list of text messages alone was sufficient for the jury. However, the trial court ruled that the State could use the summary to focus on certain messages. During Lieutenant Cleveland's testimony, the State introduced a four-page summary of relevant calls and

text messages and a seventy-seven-page list of all of the Appellant's calls and text messages from December 16 to December 21.

As to the Appellant's claim that the text messages he received were hearsay, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. A trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id.

We agree with the State and the trial court that the text messages received by the Appellant were not offered for the truth of the matter asserted. For example, at 2:34 p.m. on December 16, the Appellant texted to Jasmine Smith, "'OMW to gun and ammo.'" Smith responded, "'[F]or what?'" The Appellant answered, "'[T]o get some bullets.'" At 4:28 p.m., the Appellant texted to Desiree, "'[Sh**] at the house [b**** a**] Juice [n***a] stole my pistol.'" Desiree replied, "'[H]ow that happen?'" The Appellant answered, "'[S]natched off the couch and ran out.'" At 11:17 p.m., Jacqueline McDuffie texted to the Appellant, "'[B]e safe best friend, I got some bond money LOL.'" McDuffie later testified that she did not actually have bond money for the Appellant and was trying to make him laugh. At 7:26 p.m. on December 17, Bro texted to the Appellant, "'I swing through Big Red spot.'" The Appellant answered, "'[H]e over there?'" Without the senders' questions, the Appellant's replies had no meaning. Thus, the text messages received by the Appellant were necessary to put the text messages he sent into context. In any event, even if some of the text messages received by the Appellant were hearsay, any error is harmless in light of the overwhelming evidence of the Appellant's guilt. See Tenn. R. App. P. 36(b).

As to the Appellant's claim that the trial court erred by allowing the State to admit the summary of relevant text messages into evidence, he argues that the summary was misleading because it "was not an accurate representation of the several days prior to the shooting." He contends that the complete list of messages showed he "was going about his normal activities that week" and, therefore, "was a more accurate representation of what occurred during the time period." However, the Appellant does not contest the accuracy of the summary. Moreover, the State also introduced the complete list of text messages into evidence, and defense counsel addressed the importance of the list during closing arguments as follows:

Now, there has been an exhibit that you'll get back, two exhibits. One is the [summary] of so-called relevant phone call[s], something prepared by the State to aid [Lieutenant Cleveland] in his testimony. However, what's really relevant is the other set of text messages.

The real text messages that [were] dumped by the officer. Because what that set of text messages is doing is going to show is inbetween all of these so-called relevant text messages, he's talking to his mom, he's talking to his girlfriend, he's talking to other girls, and he's going to work, we're going back and forth.

And the relevance of that is to show he's mad about what happened but he's doing other things all day. He's not just sitting around waiting in the neighborhood [to] see if he can find Evvann and do him harm. That's not what he's doing.

Look at the text messages, you'll get it, go back through there. Go through each and every single day and you're going to -- there's hundreds of text messages and they do not all have to do with this topic.

The trial court properly ordered that, in fairness, the complete list of messages also should be introduced and be considered contemporaneously with the summary. See Tenn. R. Evid. 106. Thus, we find no error.

### D. Flight Instruction

Finally, the Appellant contends that the trial court erred by instructing the jury on flight. He argues that the instruction was improper because, although he left the scene, he did so in order to protect himself from retribution by the victim's friends. He also contends that the evidence fails to show he evaded the police or concealed himself in the community, noting that he turned himself in to law enforcement and was cooperative. The State argues that the trial court properly instructed the jury. We agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). Accordingly, trial courts have the duty to give "a complete charge of the law

- 18 -

applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). There is sufficient evidence to support a jury charge on flight where there is proof of "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.'" State v. Burns, 979 S.W.2d 279, 289-90 (Tenn. 1998) (emphasis omitted) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)); see also State v. Donald Franks, No. W2003-00003-CCA-R3-CD, 2003 WL 22351024, at *3 (Tenn. Crim. App. at Jackson, Oct. 14, 2003). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. See State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. at Jackson, Nov. 22, 1999). "Any contradictory evidence that serves to rebut the state's proof merely raises a question for the jury to resolve." Id. This court has explained that:

> "The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (quoting Rogers v. State, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)).

At trial, the Appellant objected to the flight instruction because he telephoned 911 after the shooting and turned himself in to law enforcement, but the trial court determined that the evidence supported the instruction. During the final jury charge, the trial court stated as follows:

> The flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the voluntary withdrawal of one's self for the purpose of evading arrest or prosecution for the crime charged.

Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination. The law makes no precise distinction as to the [manner] and method of flight. It may be open or it may be [a] hurried or concealed departure, or it may be a concealment within the jurisdiction.

However, it takes both the leaving of the scene, leaving the scene of the difficulty and subsequent hiding out[, evasion,] or concealment in the community, or leaving the community for part[s] unknown to constitute flight. If flight is proved the facts of flight, the fact of flight alone does not allow you to find the defendant is guilty of the crime charged -- crime alleged.

However, since flight by [a] defendant may be caused by a consciousness of guilt you may consider the fact of flight if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant.

On the other hand an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the defendant, the reason for it and the weight to be given to it are questions for you to determine.

Here, the evidence showed that the Appellant left the apartment immediately after the shooting. Latrice Mills testified that she saw men run out of an apartment, run to the church parking lot next door to the apartment complex, and get into a red car. She also testified that the car passed her and "was trying to get away from the scene." The Appellant testified that after he shot the victim, he drove home but did not stay there because he did not know who would be looking for him or his car. The Appellant stayed at a friend's house and had his girlfriend pick him up. He later returned to Douglass Avenue to turn himself in to the police. However, he did so because he learned the police had his twin brother in custody for the shooting. Thus, we agree that the evidence supported the flight instruction.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

- 20 -

_____
NORMA MCGEE OGLE, JUDGE